UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JONATHAN REINSCHMIDT, M.D.,

Plaintiff,

v.

EXIGENCE L.L.C. (DEL.) et al.,

Defendants.

**REPORT AND
RECOMMENDATION**

14-CV-997A

I.   **INTRODUCTION** ................................................................................................... 3

II.  **BACKGROUND** .................................................................................................... 4

  A.  **Plaintiff joins several partnerships or LLCs** ................................................. 4

  B.  **The Partnership Agreements** ......................................................................... 5

    i.    **Buffalo Emergency Associates, L.L.P.** ...................................................... 5

    ii.   **Multistate Holdings LLC** ............................................................................ 7

    iii.  **Multistate Holdings Partnership** ............................................................... 9

    iv.   **Exigence Medical of Hornell PLLC** .......................................................... 10

    v.    **Exigence Medical of Binghamton PLLC** .................................................. 11

    vi.   **Western New York Immediate Medical Care, LLC** ................................... 11

    vii.  **Pulse Occupational Medicine PLLC** ........................................................ 12

  C.  **Intimidation by Defendants** ......................................................................... 13

  D.  **Plaintiff decides to leave, and his exit process** ......................................... 14

  E.  **The Sale of Some Defendant Entities** ........................................................ 15

  F.  **Pre-litigation Communication** ..................................................................... 17

  G.  **This Case** ...................................................................................................... 19

  H.  **The Pending Motions** ................................................................................... 22

III. **DISCUSSION** ..................................................................................................... 26

  A.  **Motions to Dismiss Generally** .................................................................... 26

  B.  **Plaintiff's Allegations Against Alter-Ego Entities** .................................... 30

  C.  **When was plaintiff's last day as an owner?** .............................................. 35

    i.    **Buffalo Emergency Associates, L.L.P.** .................................................... 36

    ii.   **Western New York Immediate Medical Care PLLC** ...................................................39

    iii.   **Pulse Occupational Medicine PLLC** ......................................................................40

    iv.  **Multistate Holdings Partnership** .............................................................................41

    v.   **Exigence Medical of Hornell PLLC and Exigence Medical of Binghamton PLLC.**43

  D.  **Effect of May 1, 2012 (or later) Ownership Date on Plaintiff's Claims** ......................44

  E.  **Count 15: Demand for an Accounting**........................................................................49

  F.  **Counts 16 and 17: Civil RICO** ...................................................................................49

**IV.**    **CONCLUSION** ...................................................................................................................55

**V.**  **OBJECTIONS** ........................................................................................................................56

## I.   INTRODUCTION

The Hon. Richard J. Arcara referred this case to this Court under 28

U.S.C. § 636(b).  (Dkt. No. 9.)  Pending before the Court are motions by all 29[1]

defendants (Dkt. Nos. 7 and 8, updated as 20 and 21) to dismiss plaintiff's

amended complaint (Dkt. No. 13) in its entirety under Rule 12(b)(6) of the

Federal Rules of Civil Procedure ("FRCP").  Plaintiff has alleged that hiding

information about the sale of partnerships to which he had belonged, coupled

with years of underpaid profit draws, has made defendants liable on a variety of

claims including fraud, breach of fiduciary duty, breach of contract, and even

racketeering.  Defendants want the amended complaint dismissed because,

according to them, plaintiff's claims are untimely, duplicative, or vastly overstated

given how fairly he was paid when he quit the partnerships.

The Court held oral argument on August 25, 2015.  (Dkt. No. 35.)  The

Court also solicited supplemental briefing (Dkt. No. 36) and thanks the parties for

their helpful responses.  For the reasons below, the Court respectfully

recommends the following: 1) denying the motions with respect to Count 11, 12,

13, and 15; 2) denying the motions with respect to Count 10 for the individual

defendants and for defendants Buffalo Emergency Associates, L.L.P., Western

New York Immediate Medical Care PLLC, Pulse Occupational Medicine PLLC,

---

[1] Plaintiff dropped three names as defendants when moving from the original to the amended complaint: Exigence New Jersey L.L.C. (N.Y.); Exigence, LP (Pa.); and Exigence L.L.C. (Pa.).  Since plaintiff never filed a formal dismissal under Rule 41(a)(1)(A)(i), the Court recommends dismissing these three defendants under Rule 41(a)(2).

Multistate Holdings Partnership, Exigence Medical of Hornell PLLC, and

Exigence Medical of Binghamton PLLC; 3) granting the motions, without

prejudice, with respect to Count 10 for any other defendants; and 4) granting the

motions with respect to all other counts.

## II.   BACKGROUND

This case concerns allegations that defendants cheated plaintiff over the

years in two ways: first, by improperly reducing his quarterly partner distributions

while also increasing the number of shifts that he had to work; and second, by

refusing to tell him about a sale of the partnerships that would have increased the

value of his ownership interests had he stayed a few more months.  The Court

provides further background below; to avoid repetition and in accordance with

Rule 12(b), the Court has avoided using the words "alleged" or "allegedly" when

describing plaintiff's version of events.

### A. Plaintiff joins several partnerships or LLCs

Plaintiff is an emergency room physician.  After completing his residency at

the University at Buffalo, plaintiff accepted an employment offer from defendant

Buffalo Emergency Associates L.L.P.  Plaintiff signed a Partnership Agreement

with that defendant on June 11, 2001.  In 2004, plaintiff became a general

partner in Buffalo Emergency Associates, L.L.P. for a $75,000 capital

contribution.  In December 2004, plaintiff contributed $20,000 for 4.21 units of

defendant Multistate Holdings Partnership.  On January 1, 2005, plaintiff signed

4

an Operating Agreement and became a part owner of defendant Western New York Immediate Medical Care, L.L.C.; for a $25,000 capital contribution, plaintiff took a 5.12% interest in Class A membership, a 4.76% interest in Class B membership, and a 5% interest in Class C membership. At an unspecified time but possibly around 2004 or 2005, plaintiff also took a 1% share in defendants Exigence Medical of Hornell P.L.L.C. and Exigence Medical of Binghamton P.L.L.C. Plaintiff had one more ownership interest as well. Plaintiff does not mention specifics in the amended complaint, but the parties agree that plaintiff also had a 5.127% ownership interest in Pulse Occupational Medicine PLLC.

### B. The Partnership Agreements

Plaintiff entered partnership or operating agreements with each of the entity defendants that he partly owned.

### i.   Buffalo Emergency Associates, L.L.P.

The Court has a copy of the 2010 Amended and Restated Master Partnership Agreement of Buffalo Emergency Associates, L.L.P. (Dkt. No. 13-4.) This partnership is a New York limited liability partnership and conducts its business under New York law. Several sections potentially have some importance to the pending motions. Section 3 defined eligibility for partnership and different tiers of partnership. Per Attachment B to the agreement, plaintiff was a general partner with a 3% interest. Sections 1.1 and 5.18 established defendant Gregory Daniel as the Chief Executive Officer. Section 5.18.3

established defendant Joseph DiVincenzo as the Compliance Officer.  Section

5.22.2 required a super-majority vote of the voting partners for the transfer, sale,

or assignment of all or a portion of a partner's ownership interest.  That same

section required a super-majority vote for a merger or sale of substantially all the

assets of the partnership.  Under Section 10.1, "[a]ny General Partner shall have

the right to withdraw from the Partnership provided written notice of intent to

withdraw is given to the other Original and General Partners at the offices of the

Partnership ninety (90) days in advance."  (*Id.* at 34.)  Section 13 states that "[a]t

the date of the withdrawal, expulsion, death or retirement of a Partner or the

termination of a Partner, such Partner shall cease to share in Partnership income

or loss and Partnership shall not be required to return the Partner's Capital

Account except in accordance with Section 13.3.  From and after the date of

such withdrawal, death, retirement, expulsion or termination, such Partner shall

cease to be a Partner without amendment of this Agreement."  (*Id.* at 36.)

Section 13.1 stated that the withdrawing general partner must execute an

assignment of ownership interest effective upon withdrawal.  Section 13.3 stated

that, upon withdrawal of a general partner, the partnership would pay, "without

interest thereon, their capital account balance as calculated under the accrual

method of accounting as of the date of that General or Original Partner's

withdrawal . . . As determined by the Partnership and in accordance with the

accounting practices of the Partnership applied on a consistent basis.  The

6

Partnership's internal accounting department shall make this determination based on the books of the Partnership." (*Id.* at 37.)  As for payments, Section 13.3 went on to state that the balance owed to a withdrawing general partner "shall be paid in twenty-four (24) equal monthly installments commencing March 1 of the year following year of . . . withdrawal . . . occurs [sic].  The amount payable shall be without interest and the timing of payment may be accelerated in the sole discretion of the Partnership.  In the event of a default in the payment of any installment that is not cured within thirty (30) days after written notice thereof to the Partnership, the entire balance due the withdrawing Partner shall, at the option of such Partner or such Partner's legal representative, become immediately due and payable." (*Id.* at 37–38.)  Finally, Section 13.5 stated that the rights of any withdrawing general partner "are expressly conditioned upon the compliance by the Partner in respect of whom such rights arise with all of the material terms and conditions of this Agreement." (*Id.* at 38.)

>    ii.    *Multistate Holdings LLC*

The Court has a copy of the operating agreement for Multistate Holdings LLC.  (Dkt. No. 13-9.)  This partnership was a Delaware limited liability company and, per Section 1.2, operated under Delaware law.  Defendant Gregory Daniel was the managing partner.  As listed in the membership roster at Exhibit A, the only member was an entity called Multistate Holdings Partnership.  (*Id.* at 26.)  Multistate Holdings Partnership was listed as a Class A Voting Member with a

100% ownership interest and a $400,000 capital account; in turn, plaintiff had an ownership interest in Multistate Holdings Partnership.  Section 2.8 defined membership interests.  "A Membership Interest may be evidenced by a certificate issued by the Company.  A Membership Interest may be expressed on a certificate as 'Units' where a Member's Units bears the same relationship to the aggregate Units of MEMBERS that the Member's Membership Interest bears to the aggregate Membership Interests of all Members."  (*Id.* at 10.)  The partnership had only three officers—an Operating Manager, a Treasurer, and a Secretary.  Gregory Daniel was the Operating Manager, and under Section 4.3, the Operating Manager's signature was required on all documents, instruments, and obligations that bind the partnership.  The agreement did not list who the Treasurer and Secretary were.  Section 6.1 contained some provisions regarding resignation of membership.  A resigning member would receive "only the book value of his Ownership Interest, adjusted for profits and losses to the date of severance, as determined under GAAP, unless otherwise agreed by written consent of all of the other Voting Members."  (*Id.* at 17.)  Section 6.1 also stated that "[a]ny physician Member who is also a partner or employee of Buffalo Emergency Associates, LLP ('BEA'), a New York general partnership, who is severing from BEA LLP, must tender all of his Membership Interests in Multistate to Multistate as if he were withdrawing directly from Multistate."  (*Id.*)  Section 7.2 set forth how members had the right, on 10 business days' notice, to inspect the

partnership's books and records.  Section 7.3 set forth how each year, "the

Voting Members shall make or cause to be made a full and accurate accounting

of the affairs of the Company as of the close of that Fiscal Year and shall prepare

or cause to be prepared a balance sheet as of the end of such Fiscal Year . . . ."

(*Id.* at 20.)  Section 10.12 set forth that the agreement uses Delaware law but

that any state or federal litigation would have to use Erie County, New York as

the exclusive venue.

### iii.    Multistate Holdings Partnership

The Court has a copy of the partnership agreement for Multistate Holdings

Partnership.  (Dkt. No. 21-3.)  The partnership's initial Managing Partner was

Gregory Daniel.  (*Id.* at 18.)  Article VII, Section B(1) contained a provision

governing the sale of ownership interests to third parties.  "Except as otherwise

expressly set forth herein, in the event that any Partner shall at any time desire to

sell or otherwise transfer any or all of the Units, and upon his receipt of a bona

fide written offer therefor in a form suitable for acceptance, he (the 'Selling

Partner') shall immediately give written notice of such offer (the 'Notice') to each

of the other Partners and to the Partnership.  The Notice shall set forth the

number of Partnership Units ('Units') that he proposes to sell, the name of the

Selling Partner and the offeror, the price to be paid therefor, and the other terms

and conditions upon which said offer has been made."  (*Id.* at 23.)  Article VII,

Section G set forth that a partner would be considered terminated upon voluntary

resignation (*id.* at 30); all rights under the agreement would terminate immediately as of the date when partner status ended (*id.* at 31).  Section H described how, outside of the third-party purchases explained in Section B, the purchase price of a partner's units "shall be the value of such Units as set forth in the most recent Partnership valuation obtained by the Partnership from its third-party valuation consultant, subject to further adjustment as set forth in EXHIBIT A above."  (*Id.*)  Any sale would be paid in cash or by delivery of a promissory note.  (*See id.* at 33.)  As for partnership records, each partner "shall have full, complete and unrestricted access to all of the Partnership's books and records during normal business hours, upon at least 10 business days advance written request."  (*Id.* at 36.)  New York law governed the agreement.  (*Id.*)

>    iv.   *Exigence Medical of Hornell PLLC*

The Court has a copy of the operating agreement for Exigence Medical of Hornell PLLC.  (Dkt. No. 21-4.)  Section 1.2 placed the agreement under New York law.  Section 2.2 defined classes of members, though Exhibit A listed Gregory Daniel as the only Class A voting member with a 99% ownership interest.  (*Id.* at 7, 24.)  The remaining 1% ownership interest was not determined as of the time of the writing.  Gregory Daniel also was the Operating Manager per Section 4.2.  (*Id.* at 11.)  Under Section 6.1, resigning members would receive the book value of their ownership interests. (*Id.* at 15.)  Under Section 6.3, members who wanted to sell their interests first had to offer the interests to the

partnership.  Members had the right to inspect books and records under Section

7.2 and had the right to an annual accounting under Section 7.3.

### v.   Exigence Medical of Binghamton PLLC

The Court has a copy of the operating agreement for Exigence Medical of

Binghamton PLLC.  (Dkt. No. 21-5.)  Gregory Daniel was listed as the sole

member; he also was the Operating Manager.  New York law governed the

agreement.  (*Id.* at 6.)  Section 6.3 set restrictions on the transfer of ownership

interests and gave the entity and other members the right of first refusal with

respect to any transfer of ownership interests.  Sections 7.1 through 7.3 set forth

how the entity would maintain records and accountings, including records of "true

and full information regarding the status of the business and financial condition of

the Company."  (*Id.* at 17.)  Under Section 10.1, any notices affecting any part of

the agreement had to be in writing.

### vi.   Western New York Immediate Medical Care, LLC

The Court has a copy of the operating agreement for Western New York

Immediate Medical Care, LLC.  (Dkt. No. 21-6.)    Among other provisions,

Section 7.1(f) required the entity to maintain "copies of all written actions of the

Members whether at a meeting or by consent in accordance with Article VII."  (*Id.*

at 20.)  Under Section 8.4, Gregory Daniel was the initial Managing Member for a

term of 10 years.  Under Section 10.4, if the entity acquired an outgoing

member's ownership interest, then the outgoing member would be paid "the book

11

value of such Membership Interest on the last day of the month immediately preceding the Event of Transfer, as determined by the certified public accountants regularly retained by the Company in accordance with generally accepted accounting principles on the accrual basis of accounting." (*Id.* at 28.) The entity and other members had a right of first refusal for any ownership interests for sale, under Section 10.7.  Under Section 12.1(a), "A Member shall cease to be a Member upon . . . the withdrawal of the Member in accordance with the provisions of the [New York Limited Liability Company Law]." (*Id.* at 31.) Under Section 12.2, "[t]he Voluntary Withdrawal of a Member shall be permitted with the written consent of two-thirds (2/3) in Interest of the remaining Members holding the same class of membership or upon at least sixty (60) days' prior notice to the Company." (*Id.*)  Under Section 12.4, if a member withdrew then the company would repurchase the ownership interest at book value in the same way described under Section 10.4.  Section 16.1 required any notices that implicated the agreement to be in writing.  New York law governed the agreement, per Section 16.10.

> vii.   *Pulse Occupational Medicine PLLC*

The Court has a copy of the Operating Agreement for Pulse Occupational Medicine PLLC.  (Dkt. No. 38-2.)  Among other provisions, Section 6.1 required the entity to maintain certain books and records; Section 6.3 required the entity to make those books and records available to members.  Section 10.1 contained a

general prohibition on transfer of a member interest.  "No Member shall gift, sell, assign, pledge, hypothecate, exchange, encumber, or otherwise transfer to another Person all or any portion of a Membership Interest, and no Member may withdraw from the Company at any time prior to the dissolution and winding up of the Company, except in accordance with the provisions of this Article X."  (Dkt. No. 38-2 at 16.)  In the rest of Article X, the only events that prompted withdrawal short of dissolution and winding up are not relevant to this case.  Those events included death or disqualification; retirement; permanent disability; adjudication as an incompetent; and bankruptcy.  The operating agreement had no other withdrawal provision.  If one of the approved withdrawal events occurred then Section 10.3 directed that payment occur "within six (6) months of the Events of Transfer specified in Section 10.2(a) and, in the case of death, within six (6) months after the appointment of the executor or administrator or other legal representative of the estate.  In all other Events of Transfer, payment shall be made in twenty-four (24) equal monthly installments to commence on March 1st of the year following the date in which the Event of Transfer occurred."  (*Id.* at 17.)

### C. Intimidation by Defendants

While plaintiff worked for the defendant entities, and upon information and belief, he endured efforts to pay certain partners or members more than others, in ways that violated the agreements in question.  The efforts took several forms.

13

Defendants increased the number of shifts that plaintiff had to work while paying him smaller quarterly distributions than partners or members who had the same ownership interests.  Defendants also lied to partners and members in their books and records, hiding accurate information about individual and collective revenues.  The misrepresentations helped defendants move partnership assets from one entity to another in violation of the relevant operating agreements. Plaintiff accuses defendant Gregory Daniel in particular of diverting partnership assets to at least one family member.  Defendants punished partners who asked too many questions by shrinking their quarterly distributions.

### D. Plaintiff decides to leave, and his exit process

By 2010, plaintiff decided to leave Buffalo to pursue professional opportunities in Tennessee, where he now resides.[2]  In December 2010, plaintiff communicated with defendant Irving Levy about the value of his ownership interests and about his intent to withdraw as a partner or member of the entities that he owned.  Further communications led to plaintiff's signing of exit letters to memorialize his withdrawal from the entities that he partly owned.  Plaintiff signed an exit letter for Multistate Holdings Partnership on April 12, 2011.  (Dkt. No. 13-3 at 1.)  In the letter, the parties agreed that plaintiff's exit would be retroactive to

---

[2] There is some suggestion in the papers about a personal reason why plaintiff left for Tennessee.  (*See* Dkt. No. 21-2 at 10.)  This information, if explored further, might have some value in showing whether plaintiff would have left for Tennessee regardless of any sales transactions.  Because the information does not appear in the amended complaint or documents connected to it, the Court has disregarded it when resolving the pending motions.

December 31, 2010.  The exit letter did not address whether plaintiff gave prior written notice of withdrawal as required by Article VII, Section B(1) of the partnership agreement, and the record contains no other indication of such written notice.  Plaintiff entered a similar exit agreement for Western New York Immediate Medical Care, PLLC and Pulse Occupational Medicine, PLLC (*id.* at 4); the agreement bore a date of August 1, 2011 and set an effective date of August 1, 2011, but plaintiff's signature was undated.  Plaintiff signed an exit agreement for Buffalo Emergency Associates LLP (*id.* at 6); again, the agreement bore a date of August 1, 2011 and set an effective date of August 1, 2011, but plaintiff's signature was undated.  All of the exit agreements were substantially similar, including in their silence about prior written notice.  The record does not contain exit agreements for Exigence Medical of Hornell P.L.L.C. and Exigence Medical of Binghamton P.L.L.C.  Plaintiff worked his last regular shift for defendants on July 31, 2011.  For his combined ownership interests, plaintiff received four equal payments of $73,553 on March 27, May 20, June 2, and June 11, 2011.

### E. The Sale of Some Defendant Entities

Unbeknownst to plaintiff, and upon information and belief, defendants were contemplating a sale of some entities even while plaintiff was still a partner or member.  Defendants, including Gregory Daniel and Irving Levy individually, "finalized their intention to proceed with an acquisition in October 2011."  (Dkt.

No. 13 at 31 ¶ 196.)  Negotiations for the acquisition began before then.  On May

1, 2012, TeamHealth Holdings Inc. ("TeamHealth"),[3] a hospital staffing company

based in Knoxville, Tennessee, announced that it was acquiring the following

entity defendants: [4]

- Buffalo Emergency Associates, L.L.P.;
- Exigence Medical of Hornell P.L.L.C.;
- Exigence Medical of Binghamton P.L.L.C.;
- Austin Immediate Care, P.L.L.C.;
- Exigence Medical of New York, P.L.L.C.;
- Exigence of Fremont, L.L.C.;
- Exigence Management Company, Inc.;
- Exigence of Bradford, P.L.L.C.;
- Western New York Immediate Medical Care, L.L.C.; and
- Pulse Occupational Medicine, L.L.C.

Plaintiff did not have an ownership interest in every entity that sold, but every

entity in which he had an interest was sold.  The same day as the sale

announcement, May 1, 2012, defendants wrote plaintiff a check for $517,145.60.

As of the commencement of this action, defendants have paid plaintiff a total of

$811,357.60 for his ownership interests.  According to plaintiff, however, his

ownership interests climbed in value to over $4 million with the sale to

TeamHealth, and he would not have withdrawn or sold his interests had he

known that the acquisition was under discussion.  The record is not clear as to

---

[3] The Court takes judicial notice that "TeamHealth" is spelled without a space, and that it is publicly traded on the New York Stock Exchange.

[4] Plaintiff claims not to have known until oral argument exactly which entities sold.  (Dkt. No. 39 at 3 n.1.)  Apparently, the entities that were sold break down neatly as any entities that have been represented by Attorney Sullivan.

whether plaintiff feels this way in part because TeamHealth's headquarters is located in Tennessee, where he now lives.  Plaintiff asserts that discussions about the acquisition occurred not only while he was still a partner or member but after defendants knew that he was contemplating withdrawal, and that defendants intentionally withheld information from him.

### F.  Pre-litigation Communication

After the May 1, 2012 sale, plaintiff and defendants exchanged correspondence concerning the value of his ownership interests.  Plaintiff appears to have taken efforts to obtain records from defendants that would allow him to make his own calculation of value.  A dispute over records led plaintiff to send defendants a letter dated November 30, 2012.  (Dkt. No. 13-1 at 1.)  In the letter, among other issues, plaintiff expresses frustration about access to certain records and valuations that he felt he should have received.  The letter suggests a dispute over whether plaintiff had the right to certain records once his ownership interests sold, or whether plaintiff needed the records to confirm the price at which his interests sold.

Defendants responded with a letter dated January 31, 2013.  (Dkt. No. 13-8.)   Defendants confirmed that "Dr. Reinschmidt never provided any formal written notice of withdrawal required by the governing agreements and thus himself breached same."  (*Id.* at 3.)   Defendants also provided a list of plaintiff's ownership interests:

17

- Buffalo Emergency Associates, L.L.P.: 3% ownership interest, paid by GAAP basis book value.  Defendants raised an issue about a limited number of shifts that plaintiff worked, though the record does not contain any formal notices about deficiencies.  (*Id.* at 6.)  Defendants also asserted that plaintiff did not provide a formal 90-day notice of withdrawal as required in Section 10.1 of the Master Partnership Agreement.

- Western New York Immediate Medical Care PLLC: ownership interests in four locations, paid by GAAP basis book value:

  o  Transit Road, Class A: 5.40%;

  o  Niagara Falls Boulevard, Class B: 5%;

  o  Orchard Park, Class C: 5.26%; and

  o  Cheektowaga, Class D: 5.28%.

  Defendants here also suggested that plaintiff did not work as much as was required and that he did not provide formal 60-day notice of withdrawal as required by Section 12.2 of the Amended and Restated Operating Agreement.

- Pulse Occupational Medicine PLLC: 5.127% ownership interest, paid by GAAP basis book value.

- Multistate Holdings Partnership: 3.9668% ownership interest, paid by GAAP basis book value, with this ownership interest covering a number of Exigence entities that Multistate Holdings Partnership fully owned.

- Exigence Medical of Hornell PLLC and Exigence Medical of Binghamton PLLC: membership in the collective Class B Member that collectively owned 1% of each entity.  Defendants asserted that these entities retained no assets at the end of each calendar year and that, in any event, plaintiff "became ineligible to maintain his share in the 1% interest when he stopped working shifts at the facilities served by these entities."  (*Id.* at 4– 5.)

- Ownership interests in five real estate entities: 7616 Transit Holdings Partnership (5.40%); Slaughter Mopac LLC (2.6882%); 5014 Transit Holdings Partnership (5.4%); 6653 Main Street Partnership (5%); and 5020 Transit Holdings Partnership (5.4%).  Plaintiff did not name the real estate

entities as defendants in this case, and the real estate entities appear not to be at issue in any way.

For each ownership interest, defendants provided payment information that, depending on the point of view, either expands on or contradicts the information appearing at paragraphs 187 and 193 of the amended complaint.

### G. This Case

Plaintiff commenced this case[5] by filing his original complaint on November 26, 2014.  (Dkt. No. 1.)  Defendants filed the original versions of their pending motions on April 1, 2015.  (Dkt. Nos. 7, 8.)  Invoking his right under Rule 15(a)(1)(B), plaintiff filed his amended complaint on April 22, 2015.  (Dkt. No. 13.)  The amended complaint contains the following counts against the following combinations of defendants:

| Count No. | Claim | Defendants |
|-----------|-------|------------|
| 1 | Fraud by Omission: Willful failure to notify plaintiff of the TeamHealth acquisition | Gregory Daniel |
| 2 | Fraud by Omission: Willful failure to notify plaintiff of the TeamHealth acquisition | Buffalo Emergency Associates, L.L.P., Western New York Immediate Medical Care, P.L.L.C., and Pulse Occupational Medicine, L.L.C. |

---

[5] Plaintiff had filed a prior case with substantially the same claims.  (*See* Case No. 13-CV-1153.) Adopting a recommendation from Magistrate Judge Jeremiah McCarthy, Judge Arcara dismissed the prior case for insufficient diversity of citizenship.  As written, the complaint in the prior case stated that plaintiff remained a partner in the defendant entities, meaning that each side of the caption had at least one citizen of Tennessee.

| 3 | Fraud by Omission: Willful failure to notify plaintiff of the TeamHealth acquisition | Irving H. Levy and Joseph DiVincenzo, Esq. |
|---|---|---|
| 4 | Common-law Conversion: Dominion and/or interference over plaintiff's right to a 1% interest in Exigence Medical of Hornell, PLLC | Gregory Daniel and Exigence Medical of Hornell, PLLC |
| 5 | Common-law Conversion: Dominion and/or interference over plaintiff's right to a 1% interest in Exigence Medical of Binghamton, PLLC | Gregory Daniel and Exigence Medical of Binghamton, PLLC |
| 6 | Negligent Misrepresentation: Representations about plaintiff's withdrawal that did not portray any entities as subject to possible acquisition | Gregory F. Daniel, M.D., Irving H. Levy, and Joseph DiVincenzo, Esq. |
| 7 | Breach of Fiduciary Duty: Failure to inform a fellow partner of negotiations for the TrueHealth acquisition | Gregory F. Daniel, M.D., as an individual and as CEO and Managing Partner of Buffalo Emergency Associates, LLP |
| 8 | Breach of Fiduciary Duty: Failure to inform a fellow partner of the loss of his 1% interest in Exigence Medical of Hornell, PLLC | Gregory F. Daniel, M.D., as an individual and as majority member of Exigence Medical of Hornell, PLLC |
| 9 | Breach of Fiduciary Duty: Failure to inform a fellow member of negotiations for the TrueHealth acquisition | Irving H. Levy |
| 10 | Breach of Contract: Unapproved loans across entities without disclosure to partners; Failure to purchase plaintiff's ownership in Multistate Holdings Partnership based on a third-party valuation as required Article VII(H) | All Defendants |

| 11 | Breach of Contract: Failure to provide allocations of distributions based on Sharing Ratio on a quarterly basis as required by Section 8.1 of the Amended and Restated Master Partnership Agreement | Buffalo Emergency Associates, L.L.P. |
|---|---|---|
| 12 | Breach of Contract: Not calculating and providing distributions on a pro rata basis during or after the contract, per Article V of Amended and Restated Operating Agreement | Western New York Immediate Medical Care, L.L.C. |
| 13 | Breach of Contract: Failure to give plaintiff notice that his share was terminated, no knowledge of signing a document relinquishing the interest, and absence of requirement that a partner work in a particular entity or any other provision triggering automatic termination of his membership interest | Exigence Medical of Hornell P.L.L.C. |
| 14 | Unjust Enrichment: Direct benefit from plaintiff's uninformed withdrawal from the Defendant entities named in the Amended Complaint | All defendants alleged to be alter-egos of Multistate Holdings Partnership[6] |

---

[6] Exigence L.L.C. (Del.); Exigence Medical of Binghamton P.L.L.C.; Austin Immediate Care, P.L.L.C.; Exigence Medical of New York, P.L.L.C.; Exigence of Fremont, L.L.C.; Exigence New Jersey L.L.C. (N.J.); Exigence New York, L.L.C.; Nyamekye North America L.L.C. (formerly Exigence North America L.L.C.); Exigence of Pennsylvania L.L.C.; Exigence of Bradford, P.L.L.C.; Exigence of Sunbury, L.L.C.; Exigence Healthcare Solutions of Nevada L.L.C.; Exigence Health Plans, Inc.; Lakeway Emergency Management Services, L.L.C.; Pulse Occupational Medicine, L.L.C.; Exigence Arizona L.L.C.; Exigence Management Company, Inc.; Exigence Hospitalist Medical Services of Western New York, PLLC; Exigence Hospitalist Medical Services of Olean, PLLC; and Nyamekye Hospitalist Medical Services of Erie County, PLLC.

| 15 | Accounting: Plaintiff is entitled to an accounting and valuation of his ownership interests as prescribed in the various operating or partnership agreements | All defendants |
|----|-----|-----|
| 16 | Civil RICO: Violations of 18 U.S.C. § 1962(c) by conducting affairs of "Exigence" through a pattern of racketeering activity as described in paragraphs 200–217 | Buffalo Emergency Associates, LLP, Exigence Medical of Hornell, PLLC, Multistate Holdings P'ship, Western New York Immediate Medical Care, LLC, Irving H. Levy, FMB Holdings, LLP, Joseph DiVincenzo, and Gregory F. Daniel, M.D. |
| 17 | Civil RICO Conspiracy: Conspiracy to violate 18 U.S.C. § 1962(c) through two or more predicate acts as described in paragraphs 200–217 | Buffalo Emergency Associates, LLP, Exigence Medical of Hornell, PLLC, Multistate Holdings P'ship, Western New York Immediate Medical Care, LLC, Irving H. Levy, FMB Holdings, LLP, Joseph DiVincenzo, and Gregory F. Daniel, M.D. |

### *H. The Pending Motions*

In response to the amended complaint, defendants filed updated versions of their motions to dismiss.  (Dkt. Nos. 20, 21.)  Defendants argue that Counts Four, Five, Six, Seven, Eight, Nine, and 14 need to be dismissed because they are time-barred.  Relying on the effective dates in the exit agreements, defendants argue that plaintiff completed his withdrawals no later than August 1, 2011.  Since the counts in question carry a three-year limitations period, plaintiff would have needed to file his original complaint by August 1, 2014 instead of

22

November 26, 2014.  The conversion counts, Counts Four and Five, need to be

dismissed for the additional reason that they are improperly duplicative of the

breach of contract claim.  With respect to Counts Seven, Eight, and Nine,

defendants argue that these breach of fiduciary duty claims are time-barred if

premised on something other than fraud and duplicative of Counts One, Two,

and Three if resting on fraud allegations.  Defendants would have Count Six

dismissed because it also is untimely, if not based on fraud, and not cognizable if

based on fraud.  To the extent that Count Six rests on fraud, defendants would

have it dismissed because New York law does not recognize misrepresentation

involving a contingent future event.  Counts One, Two, and Three fail, according

to defendants, because of a lack of particularity and because New York law

recognizes out-of-pocket loss, not speculative gain.  Plaintiff in Count Two also

does not allege a true fiduciary or agency relationship.  Count 10 fails because it

does not describe specific damages that resulted from any breach and because

plaintiff did not provide the written notice of withdrawal that would have prompted

the obligations in the contractual provisions that he cited.  Counts 10 through 13

have the additional problem that they name the entities created by the operating

or partnership agreements in question and not the individual partners or

members themselves.  As for Count 14, defendants consider it too conclusory,

time-barred, and duplicative of the breach of contract claim.  Finally, defendants

want Counts 16 and 17 dismissed for lack of specificity regarding predicate acts and any sort of pattern of racketeering activity.

Plaintiff opposes defendants' motions in all respects.  Plaintiff argues that he has pled with specificity how defendants defrauded him—they discussed and then finalized their intent to sell to TrueHealth while he still had ownership rights, and they let him finish his withdrawal process without having any idea how much more valuable his ownership interests had become.  Since corporate or partnership entities act through individuals, plaintiff argues that the actions of the individual defendants can be imputed to the entities.  Plaintiff rejects any application of the "out-of-pocket rule" by arguing that it comes into play only when an alternative contractual bargain is indeterminate and speculative.  Here, according to plaintiff, defendants know exactly how much they received from TrueHealth.  The percentages of plaintiff's ownership interests can be applied to that dollar figure to determine the actual value of those interests.  With respect to conversion, plaintiff argues that the supposed loss of his 1% ownership interests never came to his attention and never was an issue until defendants' January 31, 2013 letter.  Plaintiff thus uses January 1, 2013 as the accrual date for his conversion claims and for at least some of his breach of contract claims.  Plaintiff argues that his conversion claims are not duplicative of his breach of contract claims because they allow for punitive damages, which he included as a demand in his amended complaint.  Plaintiff supports his negligent misrepresentation

24

claims by arguing not that defendants made a fraudulent promise but that they fraudulently concealed or omitted information that they had a duty to disclose. With respect to breach of fiduciary duty, plaintiff argues that New York courts allow fraud and breach of fiduciary claims together where the breach of fiduciary duty claims are based on allegations of fraud.  Plaintiff also asserts, in the alternative and contrary to defendants' objections, that he is allowed to present breach of fiduciary duty and fraud as a matter of alternative pleading.  As for breach of contract, plaintiff argues that he has pled that the individual defendants failed to conduct a third-party valuation and made unapproved secret loans across different entities.  Plaintiff also has pled intentional alterations in quarterly distributions that violated the operating or partnership agreements in question; these alterations, according to plaintiff, coincide with defendants' admissions that alleged problems with work shifts gave them a motive to reduce his compensation.  Plaintiff would have the conduct of the individuals imputed to the entities because they are very closely related.  Plaintiff would preserve his unjust enrichment claim as an alternative pleading.  With respect to Count 15, plaintiff notes that it is the only count that defendants have not tried to dismiss.  Plaintiff highlights that defendants concede the need for an accounting, if only as part of a strategy to ward off any other form of relief.  Finally, plaintiff stands by his racketeering counts by noting that he has pled a complex scheme to shift assets

freely between entities, all the while keeping him and other partners in the dark about the value of their ownership interests.

## III.   DISCUSSION

### A. Motions to Dismiss Generally

The general standard for claims and Rule 12 (b)(6) motions is well known. "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  FRCP 8(a)(2).   "'A short and plain statement of the claim' does not mean 'a short and plain statement of the eventual jury charge for that claim' or 'a short and plain recitation of the legal elements for that claim.'   FRCP 8(a)(2) requires a plaintiff to state, in concise but plausible fashion, what he currently thinks a defendant actually did to him, subject to revision during later discovery." *Smith v. Campbell*, No. 11-CV-540A, 2011 WL 4498797, at *3 (W.D.N.Y. Sept. 27, 2011) (Arcara, *J.*) (citation omitted).   "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between

26

possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).  Courts assess Rule 12(b)(6) motions  "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 61 (2d Cir. 2010) (internal quotation marks and citation omitted).  "Simply stated, the question under Rule 12(b)(6) is whether the facts supporting the claims, if established, create legally cognizable theories of recovery." *Cole-Hoover v. Shinseki*, No. 10-CV-669, 2011 WL 1793256, at *3 (W.D.N.Y. May 9, 2011) (Arcara, *J.*) (internal quotation marks and citation omitted).

As a preliminary matter, the Court must decide what documents it will consider when addressing the pending motions, beyond the amended complaint itself.  "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.  Where a document is not incorporated by reference, the court may neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint. However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.  It must also be clear that there exist no material disputed issues of

fact regarding the relevance of the document." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks and citations omitted).

Here, a number of documents qualify for consideration. The amended complaint and its claims refer, directly or indirectly, to several documents:

- The Amended and Restated Master Partnership Agreement of Buffalo Emergency Associates L.L.P., effective December 31, 2009; this document also was attached to the amended complaint as Exhibit D (Dkt. No. 13-4);

- The Operating Agreement for Multistate Holdings LLC, effective August 3, 2004; this document also was attached to the amended complaint as part of Exhibit I (Dkt. No. 13-9);

- The Partnership Agreement for Multistate Holdings Partnership, dated December 15, 2004 (Dkt. No. 21-3);

- The Operating Agreement for Exigence Medical of Hornell PLLC, effective June 3, 2009 (Dkt. No. 21-4);

- The Operating Agreement for Exigence Medical of Binghamton PLLC, effective September 1, 2006 (Dkt. No. 21-5);

- The Amended and Restated Operating Agreement for Western New York Immediate Medical Care, LLC, amended January 1, 2009 (Dkt. No. 21-6); and

- The Operating Agreement for Pulse Occupational Medicine PLLC, effective April 7, 2006 (Dkt. No. 38-2).

Plaintiff attached several other documents to the amended complaint:[7]

- Correspondence from plaintiff's counsel to defendants' counsel, dated November 30, 2012, attached as Exhibit A (Dkt. No. 13-1);

- The exit agreement for Multistate Holdings Partnership, signed by plaintiff on April 12, 2011 and by Gregory Daniel on April 29, 2011, attached as part of Exhibit C (Dkt. No. 13-3 at 1–2);

- The exit agreement for Western New York Immediate Medical Care, PLLC and Pulse Occupational Medicine, PLLC, dated August 1, 2011 with undated signatures, attached as part of Exhibit C (Dkt. No. 13-3 at 4–5) and as Exhibit E (Dkt. No. 13-5);

- The exit agreement for Buffalo Emergency Associates, LLP, dated August 1, 2011 with undated signatures, attached as part of Exhibit C (Dkt. No. 13-3 at 6–7);

- Letters from 2002 between Gregory Daniel and an accountant concerning some financial transactions involving Buffalo Emergency Associates, LLP, attached as Exhibit G (Dkt. No. 13-7); and

- Correspondence from defendants' counsel to plaintiff's counsel, dated January 31, 2013, attached as Exhibit H (Dkt. No. 13-8).

Together, these documents go to the heart of the allegations that plaintiff makes in his amended complaint.  No party has disputed that the copies of these documents appearing in the record are authentic.  The parties also have raised no dispute as to the relevance of any of these documents for purposes of the pending motions.  If the Court were to assess the merits of the case now then the parties almost certainly would want to add other correspondence or testimony to

---

[7] The Court has disregarded Exhibit F to the amended complaint (Dkt. No. 13-6), which appears to be an excerpt of a transcript from an oral argument that occurred in state court.  Without a full transcript, testimony under oath, the resulting decision from state court, or any other indicia of reliability or consensus on the substance, this excerpt is tantamount to plaintiff saying, "Look, here are three pages of something or other that sound like what I'm saying."  Whatever evidentiary value the excerpt might have in the future, the Court cannot do anything with it now.

place these documents in context.  No one, however, disputes that the

documents are relevant to whether plaintiff has beliefs and allegations that cross

the threshold as legally cognizable.  The Court thus will consider all of the

documents listed above as it reviews the arguments in the parties' motion

papers.

### B. Plaintiff's Allegations Against Alter-Ego Entities

There is another issue that the Court needs to address before examining

any specific counts in the amended complaint.  The issue is whether plaintiff has

pled enough information against any entity that he did not own directly.  By the

Court's count, plaintiff lists 19 defendants in paragraph 182(c) of the amended

complaint that he did not describe with a specific ownership interest:

- Exigence L.L.C. (Del.);
- Austin Immediate Care, P.L.L.C.;
- Exigence Medical of New York, P.L.L.C.;
- Exigence of Fremont, L.L.C.;
- Exigence New Jersey L.L.C. (N.J.);
- Exigence New York, L.L.C.;
- Nyamekye North America L.L.C. (formerly Exigence North America L.L.C.);
- Exigence Pennsylvania L.L.C.;
- Exigence of Bradford, P.L.L.C.;
- Exigence of Sunbury, L.L.C.;
- Exigence Healthcare Solutions of Nevada L.L.C.;
- Exigence Health Plan, Inc.;
- Lakeway Emergency Management Services, L.L.C.;
- Exigence Arizona L.L.C.;
- Exigence Management Company, Inc.;
- Exigence Hospitalist Medical Services of Western New York, PLLC;
- Exigence Hospitalist Medical Services of Olean, PLLC;

- Nyamekye Hospitalist Medical Services of Erie County, PLLC; and
- FMB Holdings, LLP.

(Dkt. No. 13 at 29–30.)  Plaintiff describes these defendants as "wholly-controlled alter egos of Buffalo Emergency Associates L.L.P., Multistate Holdings Partnership, and Western New York Immediate Medical Care, L.L.C."  (*Id.* at 29.) To support his assertion, plaintiff then uses the rest of paragraph 182 to describe why, upon information and belief, he believes that all the other defendants are alter egos.  "A single, undivided, office space served as the management office for all of the entities.  The above entities were collectively referred to by Defendants as 'The Exigence Group.'  An early 2012 press release from Western New York Immediate Medical Care, L.L.C., stated: 'The Exigence Group manages over 600,000 patient visits annually, including 118,000 urgent care visits in 2011.'"  (*Id.* at 30.)  At another point in the amended complaint, plaintiff makes additional assertions upon information and belief to support alter-ego liability:

- Though Multistate Holdings L.L.C. is registered in Delaware, its only member is Multistate Holdings Partnership, with 99% of the membership interest.

- Upon information and belief, each of the Defendants . . . share a common set of officers, partners and staff.

- The officers include [Gregory] Daniel, [Irving] Levy and [Joseph] DiVincenzo.

- The Defendants share a common principal place of business at one John James Audubon Parkway, and a common quarterly meeting in an undivided office space.

- Operating agreements for the other Defendants named in this Count were not provided upon the Plaintiff's request made to a single outside counsel who is representing all of the entities at once in violation of the Partnership Agreement.

- Upon information and belief, officers and entities made unapproved, secret loans of at least $3 million to other entities at the sole discretion of Daniel. Those loans were not disclosed to the partners of Multistate Holdings Partnership, in contravention of the Partnership Agreement.

(*Id.* at 49 ¶¶ 320–322.)  Plaintiff's RICO case statement (Dkt. No. 31) adds no further information about the alter-ego defendants.

Plaintiff's assertions, without more, likely would not suffice to bring these 19 defendants of indeterminate ownership to trial, let alone to assess a judgment against them.  For now, though, the question is whether plaintiff has asserted enough to satisfy Rule 12(b).  The Court has not found controlling case law directly on point, but analogous cases offer some guidance as to what plaintiff needed to plead to assert alter-ego liability.  For example, some cases involving allegations against alter-ego entities invoke the related principle of piercing the corporate veil.  "Generally, however, piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury. While complete domination of the corporation is the key to piercing the corporate

veil, especially when the owners use the corporation as a mere device to further their personal rather than the corporate business, such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required." *Morris v. N.Y.S. Dep't of Taxation & Fin.*, 623 N.E.2d 1157, 1160–61 (N.Y. 1993) (citations omitted); *cf. Baby Phat Holding Co., LLC v. Kellwood Co.*, 997 N.Y.S.2d 67, 70 (App. Div. 2014) ("Allegations that corporate funds were purposefully diverted to make it judgment proof or that a corporation was dissolved without making appropriate reserves for contingent liabilities are sufficient to satisfy the pleading requirement of wrongdoing which is necessary to pierce the corporate veil on an alter-ego theory.") (citation omitted).  Even a successful pleading of dominion and control will not suffice to keep an alleged alter-ego defendant beyond Rule 12 motions; plaintiffs asserting alter-ego liability also have to assert that the alter egos did something fraudulent or otherwise harmful, by themselves or as orchestrated by other defendants.  *Cf. Se. Texas Inns, Inc. v. Prime Hosp. Corp.*, 462 F.3d 666, 679 (6th Cir. 2006) (affirming a dismissal of claims of alter-ego liability where "conclusory allegations, couched in terms of a contractual breach, are not tantamount to the fraud or injustice required to pierce the corporate veil"); *see also Mincey v. World Sav. Bank, FSB*, 614 F. Supp. 2d 610, 622–23 (D.S.C. 2008) ("Golden West and Wachovia cannot be held liable for World's actions simply because Golden West is World's parent, and Wachovia is Golden West's parent.  It is clear from Plaintiffs' Amended

Complaint that they recognize as much because they allege 'each of the Defendants sued herein acted through and was the agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, assignee and/or alter-ego of each of the remaining Defendants and was at all times acting within the purpose and scope of such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego, partnership or employment and with the authority, consent, approval and ratification of each remaining Defendant.' (Am. Compl. ¶ 11.) Such an allegation is a kitchen-sink approach to the task of attempting to hold Golden West and Wachovia liable for actions of WSB.").

Here, plaintiff's assertions fall short of what he needed to plead to assert alter-ego liability. In the amended complaint, plaintiff asserts that any defendants with whom he did not have a direct ownership interest nonetheless had the same principal place of business, officers, and legal counsel. Plaintiff further has asserted that at least some defendants are near-exclusive owners of other defendants. These assertions are enough, for Rule 12 purposes, to show that the defendants with whom plaintiff had a direct ownership interest exercised dominion and control over any other defendants. Nowhere in the amended complaint or RICO case statement, however, does plaintiff explain what any of the alter-ego defendants did to him. Some or all of the alter-ego defendants might be implicated in plaintiff's allegations about unapproved loans and asset transfers, but no confirming information currently seems to exist. Alternatively,

plaintiff also fails to explain how any of the individual defendants or the

defendants that he partly owns manipulated the alter-ego defendants in ways

that caused him damages.  If subsequent discovery uncovers any such

manipulation then plaintiff should be allowed to bring specific alter-ego

defendants back into the case.  For now, though, the Court recommends granting

the defense motions to dismiss, without prejudice, all 19 defendants listed above.

### C. When was plaintiff's last day as an owner?

The Court has one more issue to address before moving to the counts in

the amended complaint: the exact date when each of plaintiff's ownership

interests ended.  When plaintiff's ownership interests ended—if they have ended

in accordance with the relevant operating or partnership agreements—affects

nearly every count in the amended complaint.  The dates of termination would

resolve the defense arguments about the expiration of limitations periods.  The

dates of termination also would reflect compliance, non-compliance, or waiver

with respect to the relevant operating or partnership agreements.  The dates of

termination additionally could be compared to what plaintiff has pled about the

timeline for the TeamHealth acquisition; as the Court hinted in its request for

supplemental briefing, an overlap of ownership interests and negotiations for

acquisition could strengthen plaintiff's arguments that defendants violated a

fiduciary duty or contractual obligation to keep him informed.  The importance of

the termination dates thus requires the Court to take a closer look at what happened with each of plaintiff's ownership interests.

    *i.*   *Buffalo Emergency Associates, L.L.P.*

   Under Section 10.1 of the Amended and Restated Master Partnership Agreement, "[a]ny General Partner shall have the right to withdraw from the Partnership provided written notice of intent to withdraw is given to the other Original and General Partners at the offices of the Partnership ninety (90) days in advance."  (Dkt. No. 13-4 at 34.)  Stated inversely, Section 10.1 means that a General Partner has *no* right to withdraw unless he satisfies four conditions: (1) he provides notice in writing; (2) he provides that written notice to all of the other Original and General Partners; (3) he sends the written notice to all of the other Original and General Partners at the Partnership offices; and (4) the notice occurs at least 90 days before any withdrawal formally takes effect.  Paragraph 185 of the amended complaint notwithstanding,[8] plaintiff never provided any written notice.  Through their January 31, 2013 letter, defendants agreed that plaintiff never provided any written notice.  (*See* Dkt. No. 13-8 at 6.)  *Cf. Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) ("[W]here a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true.") (citation omitted).  The exit agreement of August 1, 2011 did not waive the written

---

[8] "In December 2010 the Plaintiff gave proper notice to Chief Financial Officer Irving H. Levy that he sought to withdraw from 'Exigence.'"  (Dkt. No. 13 at 30 ¶ 185.)

notice requirement; additionally, there is no evidence in the record that any other

Original or General Partner (*see* Dkt. No. 13-4 at 46–47) ever signed or even

knew about the exit agreement.  The exit agreement also had no date for

plaintiff's signature.  If August 1, 2011 had been intended as a retroactive date

then plaintiff chronologically would have been an owner past that date, until he

signed.

Further non-compliance with the Master Partnership Agreement came from

the method of payment that defendants attempted under the exit agreement.

Under Section 13.3, an amount owed to a withdrawing General Partner "shall be

paid in twenty-four (24) equal monthly installments commencing March 1 of the

year following year of termination, withdrawal, retirement, expulsion or death

occurs [sic]."  (Dkt. No. 13-4 at 37.)  Despite these provisions, defendants have

admitted to making four payments: $31,893.14 in December of 2011;

$214,296.86 in May of 2011; $23,000.00 in February of 2012; and $23,000.00 in

March of 2012.  (Dkt. No. 13-8 at 6.)  Defendants claimed to have calculated

these payments based on the value of plaintiff's interests as of August 1, 2011.

This schedule did not follow what would have been the required schedule under

the Master Partnership Agreement.  Defendants' payment schedule has the

additional problem that it contradicts the purported termination date in the exit

agreement.  If plaintiff ceased to be a General Partner as of August 1, 2011 then

why did defendants pay him his largest lump sum three months earlier?  On top

of that problem, nothing in the record addresses whatever became of plaintiff's continuing interest as a Physician Partner.  (*See* Dkt. No. 13-3 at 7.)  Defendants cannot possibly have understood plaintiff's ownership interest to have ended as of August 1, 2011, the day after his purported last day of work, if plaintiff continued after that date as a Physician Partner.

In the face of internal contradictions and non-compliance with the Master Partnership Agreement, and for Rule 12 purposes that can be revisited following discovery, adhering to the amended complaint and the New York Partnership Law is the better course.  Plaintiff has pled that defendants were sending him money for various ownership interests as late as May 1, 2012.  No payments occurred after that date.  Under Rule 12, plaintiff is entitled to the assumption that defendants completely moved on without him as of May 1, 2012.  Any non-compliant attempt to have eliminated plaintiff as a General Partner or Physician Partner before then, through exit agreements or payments, was subordinate to the statutory directive that "[a] partner ceases to be a partner and to have the power to exercise any rights or powers of a partner upon assignment of *all* of his partnership interest.  Unless otherwise provided in the partnership agreement, the pledge of, or the granting of a security interest, lien or other encumbrance in or against, any or all of the partnership interest of a partner *shall not cause the partner to cease to be a partner or to have the power to exercise any rights or powers of a partner*."  N.Y. P'ship Law § 121-702(a)(4) (emphasis added); *see*

*also* N.Y. P'ship Law § 121-402 (defining which events have to occur before "[a]

person ceases to be a general partner of a limited partnership").  For purposes of

Rule 12 and the pending motions, therefore, plaintiff still had some sort of

ownership interest in Buffalo Emergency Associates, L.L.P. at least through May

1, 2012.

    *ii. Western New York Immediate Medical Care PLLC*

    Under Section 12.1 of the Amended and Restated Operating Agreement,

"[a] Member shall cease to be a Member upon  . . . the withdrawal of the Member

in accordance with the provisions of the Act [*i.e.*, the New York Limited Liability

Company Law]."  (Dkt. No. 21-6 at 31.)  A member's right to withdraw was

limited.  "The Voluntary Withdrawal of a Member shall be permitted with the

written consent of two-thirds (2/3) in Interest of the remaining Members holding

the same class of membership or upon at least sixty (60) days' prior notice to the

Company."  (*Id.*)  The limitation in the Operating Agreement coincided with a

statutory limitation.  "A member may withdraw as a member of a limited liability

company only at the time or upon the happening of events specified in the

operating agreement and in accordance with the operating agreement."  N.Y. Ltd.

Liab. Co. Law § 606(a).

    Based on the pleadings and the available documentary evidence, and

again for Rule 12 purposes, the circumstances of plaintiff's separation from this

entity fell short of the contractual and statutory standard.  Plaintiff never provided

the required 60-day notice.  Defendants appear not to have had the authority to waive the requirement and, in any event, showed no intention of waiving it when they emphasized the point in the January 31, 2013 letter.  (Dkt. No. 13-8 at 7.) The record contains no indication of a two-thirds approval of other members. Defendants also did not follow the schedule of payments set forth in the Operating Agreement.  Under Section 12.4(a), plaintiff should have received 24 equal installments beginning on March 1 of the year following the date when withdrawal occurred.  Instead, and possibly motivated by a desire to clear out the obligation before the TrueHealth acquisition, plaintiff received one payment in December 2011 and what defendants believed to be the balance owed in May 2012.  The Court cannot rule out that plaintiff signed the exit agreement after August 1, 2011, since his signature was undated.  Defendants' non-compliance with multiple provisions of the Operating Agreement and the Limited Liability Company Law means that, this early in the case, the Court cannot accept August 1, 2011 as a termination date based on the exit agreement.  Plaintiff has pled that he maintained some sort of ownership interest at least through May 1, 2012. Subject to further developments during discovery, he is entitled to that assumption.

> iii.   *Pulse Occupational Medicine PLLC*

This entity also falls under the Limited Liability Company Law.  Section 606(a) applies equally here.  As for the Operating Agreement, Section 10.1

states that "no Member may withdraw from the Company at any time prior to the
dissolution and winding up of the Company, except in accordance with the
provisions of this Article X."  (Dkt. No. 38-2 at 16.)  Section 10.2 then lists five
events that would prompt the termination of the membership interest.  None of
the events apply here; the events concern death, disqualification, retirement,
permanent disability, incompetency, and bankruptcy.  Section 10.3 covers how
payment would be made when an event in Section 10.2 occurs.  In short, the
Limited Liability Company Law and Article X of the Operating Agreement, under
the circumstances of this case, completely prohibited plaintiff's withdrawal.
Nothing in the Operating Agreement appears to have authorized defendants to
attempt to cut ties with plaintiff by way of an exit agreement with an undated
signature or by any schedule of payment apart from dissolution.  Therefore, for
Rule 12 purposes that can be revisited after discovery, the Court must accept
plaintiff's pleadings indicating that he maintained some sort of ownership interest
in this entity—at least through May 1, 2012 and possibly to the present time.

   *iv.* *Multistate Holdings Partnership*

  As a general partnership, this entity falls under the Partnership Law.
Partnership Law § 121-702(a)(4) and § 121-402 thus apply.  As for the
Partnership Agreement, Article VII sets restrictions on the sale or transfer of
partnership interests.  "Each Partner hereby expressly covenants and agrees that
he will not sell, assign, mortgage, pledge, encumber or otherwise transfer or

dispose of any of his Partnership Interests (referred to as "Units" in this Article

VII), except in accordance with the provisions of this Agreement.  The restrictions

imposed by this Agreement shall apply to involuntary as well as voluntary

transfers, and any transfer made or attempted to be made in contravention of the

terms of this Agreement *shall be void and of no effect*."  (Dkt. No. 21-3 at 23

(emphasis added).)  Any attempt at sale or transfer of a partnership interest

requires written notice to the other partners and to the partnership.  (*See id.*)

Article VII(G)(1) links partner status to "employment or contractor status" with

Buffalo Emergency Associates, LLP and states that termination of employment or

contractor status ends partner status with this entity.  (*See id.* at 30.)  Article

VII(G)(4) states that "[n]otwithstanding any provision of this Agreement, if a

Partner ceases to be a Partner of the Partnership, under any provision of this

Agreement, his position as Managing Partner and any common-law employment

by the Partnership, and all his rights under this Agreement, shall terminate,

effective immediately as of the date he ceases to be a Partner."  (*Id.* at 31.)

Apart from the sections quoted above, the Partnership Agreement does not have

a withdrawal provision *per se*.

As with the entities discussed previously, the way in which defendants

handled notice clouds the issue of when plaintiff ceased to be a partner.  Since

the Partnership Agreement did not have its own section explicitly covering

withdrawals, any purported withdrawal by plaintiff would have fallen under the

more general provisions for sale or transfer.  The general provisions required an

advance written notice to the other partners that did not happen here.  Under the

terms of Article VII, any attempted withdrawal by plaintiff thus was null and void.

Partnership Law § 121-702(a)(4) also would apply to say that plaintiff never

assigned all of his partnership interest.  Whether the payments that plaintiff

received could constitute an accord and satisfaction or some similar doctrine is

unclear at this time and will have to await more factual developments during

discovery.  For Rule 12 purposes, plaintiff has pled that he retained some

residual partnership interest in Multistate Holdings Partnership at least through

May 1, 2012, and he is entitled to that assumption.  Neither the Partnership Law

or any documentary evidence requires a different conclusion for now.

>    v.  *Exigence Medical of Hornell PLLC and Exigence Medical of*
>        *Binghamton PLLC*

These entities fall under the Limited Liability Company Law and have

essentially identical operating agreements.  Section 6.3 of both agreements

restrict transfer of ownership interests without first offering the interests to the

company and other voting members by way of written notice.  (Dkt. No. 21-4 at

15; Dkt. No. 21-5 at 15.)  Under Section 10.1 of both agreements, any notice that

affects any provision of the agreements has to be in writing.  (Dkt. No. 21-4 at 21;

Dkt. No. 21-5 at 21.)  Since the agreements do not have an explicit withdrawal

provision, Section 606(a) of the Limited Liability Company Law defaults to the

prohibition that "a member may not withdraw from a limited liability company prior to the dissolution and winding up of the limited liability company."

Plaintiff's status with these two entities is far too ambiguous to resolve by way of motion to dismiss.  The parties agree that plaintiff was part of a collective 1% ownership interest for each entity.  Plaintiff never provided written notice of an intent to transfer or otherwise to relinquish that interest.  The operating agreements did not provide for means of withdrawal apart from dissolution and winding up.  Defendants have not paid plaintiff for either of these ownership interests.  In their January 31, 2013 letter, defendants asserted that these entities retained no capital or equity and that plaintiff became ineligible to maintain his ownership interests when he stopped working shifts.  Defendants' assertions may or may not be true but are fact-intensive and must await discovery.  For now, under Rule 12, plaintiff asserted in his amended complaint that he retains some sort of ownership interest in these entities.  No uncontested documentary evidence says otherwise.  Subject to further developments in the case, plaintiff has shown plausibly that he in fact had some kind of ownership interest in these entities at least through May 1, 2012.

### D. Effect of May 1, 2012 (or later) Ownership Date on Plaintiff's Claims

Plaintiff's ability to plead some kind of continued ownership interest in his entities at least through May 1, 2012 is critical because it reshapes the contours

of his amended complaint.  All of plaintiff's claims become timely.  Out of 17

counts in the amended complaint, the first 14 ultimately reduce to a claim that

plaintiff's ownership interests jumped in value after October 2011, when

defendants allegedly finalized their intent to sell at least some of the entities to

TrueHealth.  Every operating or partnership agreement in question contains

some kind of provision requiring the respective entities to assess the value of an

outgoing ownership interest as of the date of formal withdrawal.  If the valuation

simply occurs as of May 1, 2012 instead of August 1, 2011 then the valuation

process should capture any increase in value that plaintiff has alleged.  For this

reason, the Court finds not only that plaintiff has plausibly stated his claims for

breach of contract but also that the breach of contract claims are capable of

providing him full relief.  The claims for fraud by omission, common-law

conversion, negligent misrepresentation, and breach of fiduciary duty might

provide context for the breach of contract but do not allege any actionable

conduct that was collateral to or extraneous to the contractual obligations under

the various operating or partnership agreements.  *See Rocanova v. Equitable

Life Assur. Soc. of U.S.*, 634 N.E.2d 940, 944 (N.Y. 1994) (assenting to the

principle that "a contract action cannot be converted to one for fraud merely by

alleging that the contracting party did not intend to meet its contractual

obligations"); *Coppola v. Applied Elec. Corp.*, 732 N.Y.S.2d 402, 403 (App. Div.

2001) ("Assuming the truth of plaintiff's allegations and according him every

possible favorable inference to determine only whether the facts alleged fit within any cognizable legal theory, it is clear that the claimed fraud was not collateral or extraneous to the contract, did not allege any damages, including those for foregone opportunities, that would not be recoverable under a contract measure of damages, and failed to plead a breach of duty separate from a breach of the contract.") (citations omitted); *Big Apple Car, Inc. v. City of N.Y.*, 650 N.Y.S.2d 730, 732 (App. Div. 1996) ("Plaintiff may maintain causes of action for breach of contract and for an account stated for the services performed under those contracts, but it may not simultaneously pursue causes of action for fraud in the inducement to enter into those contracts.") (citations omitted); *see also Balta v. Ayco Co., LP*, 626 F. Supp. 2d 347, 361 (W.D.N.Y. 2009) (Siragusa, *J.*) ("Any fiduciary duties allegedly breached by Defendant arose, expressly or impliedly, under the contract, and the parties had no relationship of trust apart from their contractual relationship.  Whether viewed as a failure to act prudently or a failure to disclose information, the alleged breach of fiduciary duty boils down to Defendant's failure to provide good investment advice, which was its primary obligation under the contract.  Accordingly, Defendant is entitled to summary judgment on the fiduciary duty claims.  For the same reasons, Plaintiffs' constructive fraud claims are duplicative of the breach of contract claims, since they are based on the alleged breach of the same fiduciary duties, which arose,

expressly or impliedly, from the parties' contract.") (citation omitted).  Counts One
through Nine and 14 thus are superfluous compared to Counts 10 through 13.

One other argument from Attorney Sullivan's defendants warrants a brief
comment.  The argument is that plaintiff cannot accuse the entities of breach of
the partnership or operating agreements because they "are not parties to those
agreements.  The individual partners or members are.  An *entity* which is *created*
by an operating or partnership agreement cannot be in breach of that agreement.
Rather, an action for breach of an operating or partnership agreement is only
properly brought against the individual partners or members who signed the
agreement."  (Dkt. No. 20-3 at 17.)  Plaintiff counters that he "alleges sufficient
facts to show that Defendants are not separate and distinct entities but rather a
conglomerate of shell entities controlled by a small group of individuals and/or
entities.  The table in Plaintiff's Declaration In Opposition summarizes the factual
allegations contained in the Amended Complaint and helps to illustrate the
interconnectivity of the Defendants. In sum, twenty one (21) entities have the
same princip[a]l place of business; Gregory Daniel is listed as either registered
agent or member of ten (10) entities; Joseph DiVincenzo is the officer of
'Exigence' and Multistate Holdings Partnership; FMG Holdings, L.L.P. is an alter-
ego of Irving Levy and member of Multistate Holdings Partnership."  (Dkt. No. 26
at 24.)  Depending on how the facts of the case develop during discovery, both
sides could be right.  A partnership or limited liability company with an identity

47

*distinct from its partners or members* likely cannot be sued for breach of the agreement that created it, assuming that the agreement does not somehow give the created entity the responsibility to abide by its provisions.  *See Cordts-Auth v. Crunk, LLC*, 815 F. Supp. 2d 778, 798 (S.D.N.Y. 2011); *Purchase Partners II, LLC v. Max Capital Mgmt. Corp.*, 19 Misc. 3d 1123(A), 862 N.Y.S.2d 817 (Sup. Ct. 2008) (table case).  In contrast, based on the authorities that the Court cited in Section III(B) above, plaintiff successfully has pled that the entities that he partly owned were alter egos of the individual defendants.  Discovery eventually will reveal exactly what relationship the individual defendants had with the entities that plaintiff partly owned.  Since the Court cannot define that relationship from the pleadings and motion papers alone, the argument based on *Cordts-Auth* and *Purchase Partners* is better saved for another day.  The Court respectfully rejects defendants' argument but without prejudice to renewing it when information from discovery can offer more guidance.

The Court thus recommends granting defendants' motions to dismiss Counts One through Nine, and Count 14, in their entirety.  The Court recommends denying the motions with respect to Counts 10 through 13, except to dismiss without prejudice the 19 alter-ego defendants from Count 10 for the reasons stated previously.

### E. Count 15: Demand for an Accounting

The Court's discussion of Count 15 will be brief.  The defendants represented by Attorney Sullivan did not move to dismiss Count 15 at all.  (*See generally* Dkt. No. 20-3.)  The defendants represented by then-Attorney Vilardo[9] made only the nominal opposition that "plaintiff is not entitled to this Court's aid in obtaining an accounting for the simple reason that the defendants are and always have been willing to provide the plaintiff with access to information under their control regarding his former interests in the Exigence Group."  (Dkt. No. 21-2 at 42.)  Without a more substantive argument in favor of dismissal, and without a motion seeking an accounting from plaintiff at this time, the Court is content to let the count stand.  To the extent that defendants' motions seek dismissal of Count 15, the Court recommends denying them.  The Court recommends that the denial be without prejudice to any party to make substantive arguments for or against any future motion to compel an accounting.

### F. Counts 16 and 17: Civil RICO

Finally, the Court will assess defendants' motions to dismiss Counts 16 and 17, which allege civil violations of 18 U.S.C. § 1962(c) and (d).  Plaintiff's RICO case statement (Dkt. No. 31) contains three categories of misconduct attributed in some way to all defendants.  Plaintiff asserts that defendants "made fraudulent and material omissions of fact to Plaintiff by failing to disclose plans of

---

[9] Now a District Judge with this Court.

the sale of the Exigence Group when it was under a duty to do so (Pl. Amend.
Compl. ¶¶ 178, 219, 233-240, 247-254); took money from other named entities
within Exigence and made secret, unapproved loans of at least $3 million to other
entities within Exigence." (Dkt. No. 31 at 4; *see also id.* at 2, 3, 5, 6, 7.)  Plaintiff
also alleges a pattern of racketeering activity as described in paragraphs 200–
217 of the amended complaint.  According to those paragraphs, defendants
began a scheme at least 13 years ago "to illegally reward certain individuals,
such as [Gregory] Daniel, more than others."  (Dkt. No. 13 at 32.)  "Upon
information and belief, to effectuate these schemes, the Defendants illegally
reduced quarterly distributions of certain partners causing a disparity with other
partners of equal standing.  Upon information and belief, to effectuate these
schemes, the Defendants coerced and controlled members, partners, and
employees by threat of economic harm, physical harm, and unwarranted legal
action.  Defendants exploited that fear in order to induce the partners and
members to work additional hours, accept less money, cooperate, and not
question Defendants." (*Id.* at 32–33.)  Plaintiff included allegations that
defendants hid and moved money and paid at least one family member.  For
jurisdictional purposes, plaintiff included the allegation that defendants advanced
their scheme of improper financial management, uneven payments, and
intimidation through use of telephones and the mails.  Plaintiff listed the exit
agreements and defendants' January 31, 2013 letter as predicate acts, along

with the 2002 correspondence to and from an accountant regarding certain financial transactions.  (*See* Dkt. No. 13-7.)  Finally, plaintiff asserted that the pattern of racketeering activity and the enterprise were separate.  Plaintiff labeled as the enterprise all of the entities named as defendants in Counts 16 and 17.  According to plaintiff, "[t]he 'usual and daily activities' of the Enterprise is that of the operation of and staffing of emergency room contracts and the operation of urgent care clinics and the day to day business activities that relate to the enterprise," (Dkt. No. 31 at 14) activities that implicated different defendant entities across state lines.

A review of the RICO standard is in order.  "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  Section 1962(d) prohibits conspiracy to violate Section 1962(c).  "'[E]nterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  "The enterprise must be separate from the pattern of racketeering activity, and distinct from the person conducting the affairs of the enterprise.  Thus, RICO requirements are most easily satisfied when the enterprise is a formal legal

entity." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d

Cir. 2004) (citations omitted).  The RICO standard "further requires that a nexus

exist between the enterprise and the racketeering activity that is being

conducted."  *Id.* at 174 (citations omitted).  A pattern of racketeering activity

"requires at least two acts of racketeering activity, one of which occurred after the

effective date of this chapter and the last of which occurred within ten years

(excluding any period of imprisonment) after the commission of a prior act of

racketeering activity."  18 U.S.C. § 1961(5).  The various statutory provisions

coalesce into seven elements that plaintiff must plead: "(1) that the defendant[s]

(2) through the commission of two or more acts (3) constituting a 'pattern' (4) of

'racketeering activity' (5) directly or indirectly invest[] in, or maintain[] an interest

in, or participate[] in (6) an 'enterprise' (7) the activities of which affect interstate

or foreign commerce."  *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.

1983).  Plaintiff has to plead any fraudulent predicate acts with the particularity

required by Rule 9(b).  *See First Capital*, 385 F.3d at 178; *Anatian v. Coutts Bank

(Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999) (allegations that satisfy Rule

9(b) "must (1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made,

and (4) explain why the statements were fraudulent") (internal quotation marks

and citations omitted).  "[T]o serve the purposes of Rule 9(b), we require plaintiffs

to allege facts that give rise to a strong inference of fraudulent intent.  The

52

requisite 'strong inference' of fraud may be established either (a) by alleging facts

to show that defendants had both motive and opportunity to commit fraud, or (b)

by alleging facts that constitute strong circumstantial evidence of conscious

misbehavior or recklessness."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124,

1128 (2d Cir. 1994) (citations omitted).

Here, plaintiff's RICO allegations fall short in several ways.  Any of the

allegations about withholding information, improper valuation stemming from the

withholding of information, and partners not being paid properly amount to

violations of the respective operating and partnership agreements.  As with the

counts dismissed above, plaintiff can seek full monetary relief through his breach

of contract counts.  *Cf., e.g., Faryniarz v. Ramirez*, 62 F. Supp. 3d 240, 254 (D.

Conn. 2014) (dismissing a RICO claim in part because it rested solely on failure

to perform written and oral agreements); *Helios Int'l S.A.R.L. v. Cantamessa*

*USA, Inc.*, No. 12 CIV. 8205, 2013 WL 3943267, at *9 (S.D.N.Y. July 31, 2013)

(finding that a dispute about the extent of authority to manage jewelry

merchandise "supports causes of action for breach of contract and/or fiduciary

duty, rather than federal criminal fraud that was committed as part of a 'broad-

based' criminal racketeering scheme").  As for the allegations about how

defendants "coerced and controlled members, partners, and employees" in

various ways, plaintiff does not provide specific instances.  For example, plaintiff

perhaps could have provided specific times when he attempted to exercise his

rights to inspect books and records and faced direct retaliation in the form of a subsequent profit draw that was unusually low. *Cf., e.g., Rothberg v. Chloe Foods Corp.*, No. CV-06-5712(CPS), 2007 WL 2128376, at *15 (E.D.N.Y. July 25, 2007) (citing specific instances of fraudulent UCC-1 financing statements and what information was fraudulent); *Ctr. Cadillac, Inc. v. Bank Leumi Trust Co. of N.Y.*, 808 F. Supp. 213, 230 (S.D.N.Y. 1992) ("Although the claims with respect to these Defendants are not as precise as they might be, the complaint does allege some rather remarkable conduct on the part of these Defendants. Plaintiffs claim that Garvey and Levine, after consulting with Simon by phone, presented Plaintiffs with incomplete documents and blank signature pages and fraudulently represented that the obligations incurred would be on the same terms as prior loans. Plaintiffs also claim that they were induced to borrow additional money in the first place based on Bank Leumi's misrepresentations as to the rate of interest that would be charged. Simon allegedly personally benefitted from the scheme by using Plaintiffs' debt obligations to pressure Plaintiffs into selling him a new cadillac below cost. Plaintiffs also allege that Bank Leumi repeatedly refused to provide them with regular statements documenting the nature of their obligations, and as a result, they continued making payments on the fraudulent obligations."). More importantly, plaintiff does not provide a single example of defendants either coercing and controlling *him* or directly injuring him through the coercing and controlling of others. The

accountant correspondence might indicate some accounting irregularities that occurred nearly 14 years ago but do not go nearly far enough to establish scienter for fraud.  Finally, the allegation about a family member of Gregory Daniel receiving an improper financial benefit does not specify which family member, what the benefit was, or when the event happened.

To be candid, the record comes closer to showing that a small physician practice group grew too much and too quickly into a bewildering array of entities that the original physicians lacked the time or the skill to keep under control. Some physicians may have wound up unhappy, and the people in charge of the various entities may have violated operating or partnership agreements in the process.  None of these problems, however, comes anywhere near the pleading standard for racketeering.  For these reasons, the Court recommends granting defendants' motions to dismiss Counts 16 and 17 in their entirety.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends the following actions for defendants' motions (Dkt. Nos. 20, 21 superseding 7, 8) : 1) denying the motions with respect to Count 11, 12, 13, and 15; 2) denying the motions with respect to Count 10 for the individual defendants and for defendants Buffalo Emergency Associates, L.L.P., Western New York Immediate Medical Care PLLC, Pulse Occupational Medicine PLLC,  Multistate Holdings Partnership, Exigence Medical of Hornell PLLC, and Exigence Medical of

Binghamton PLLC; 3) granting the motions without prejudice with respect to Count 10 for any other defendants; and 4) granting the motions with respect to all other counts.

Per note 1 *supra*, the Court also recommends dismissing Exigence New Jersey L.L.C. (N.Y.); Exigence, LP (Pa.); and Exigence L.L.C. (Pa.) from this case.

## V.   OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP 72.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).


        SO ORDERED.

                                          /s Hugh B. Scott
                                    _____
                                    HONORABLE HUGH B. SCOTT
                                    UNITED STATES MAGISTRATE JUDGE
DATED: January 19, 2016